UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

MARK VALENTINE,

                          Plaintiff,                              **MEMORANDUM & ORDER**
                                                                  18-CV-3985 (MKB)

             v.


COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Mark Valentine commenced the above-captioned action pursuant to 42 U.S.C.

§ 405(g), seeking review of a final decision of the Commissioner of Social Security (the

"Commissioner") denying his claim for supplemental security income ("SSI") under the Social

Security Act (the "SSA").  (Compl., Docket Entry No. 1.)  The Commissioner moves for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure,

arguing that (1) the decision of Administrative Law Judge Yvette Diamond (the "ALJ") is based

upon the application of the correct legal standards and is supported by substantial evidence, and

(2) the evidence submitted to the Appeals Council does not warrant remand.  (Comm'r Mot. For

J. on the Pleadings ("Comm'r Mot."), Docket Entry No. 13; Comm'r Mem. of Law in Supp. of

Comm'r Mot. ("Comm'r Mem."), Docket Entry No. 14.)  Plaintiff cross-moves for judgment on

the pleadings, arguing that (1) the ALJ failed to provide a full and fair hearing by failing in her

duty to develop the record and improperly substituting her own medical judgment; (2) the new

and material evidence presented to the Appeals Council warrants remand; and (3) the ALJ failed

to meet her burden at step five because her determination is based on legal and factual error.  (Pl.

Mem. of Law in Supp. of Cross-Mot. for J. on the Pleadings ("Pl. Mem."), Docket Entry No. 18.)

For the reasons discussed below, the Court denies the Commissioner's motion, grants Plaintiff's

motion, and remands this action for further administrative proceedings consistent with this

Memorandum and Order.

## I. Background

Plaintiff was born in 1969, attended special education classes, and completed schooling

through the eighth grade. (Certified Admin. Record ("R.") 315, 323.) Plaintiff has some

carpentry training. (R. 145.) Although Plaintiff does not have any past relevant work, he was

employed in shipping and receiving from January of 1998 to January of 2011 and as a

stocker/cleaner from November of 2011 to January of 2012. (R. 187.)

On October 17, 2014, Plaintiff applied for SSI, stating that he has been disabled as of

September 1, 2014, due to a gunshot wound to his bladder, complete deafness in his right ear,

partial deafness in his left ear, back conditions, limited mobility, nerve damage in his arms and

legs, bipolar disorder, depression, post-traumatic stress disorder (PTSD) with panic attacks, and a

heart murmur. (R. 176–77.) On July 29, 2015, the Social Security Administration denied

Plaintiff's application. (R. 192.) Plaintiff subsequently requested a hearing before an

administrative law judge. (R. 204.) An administrative hearing was held on August 8, 2017

before the ALJ. (R. 137–75.) By decision dated August 30, 2017, the ALJ found that Plaintiff

was not disabled. (R. 7–27.) On May 23, 2018, the Appeals Council denied review, rendering

the ALJ's decision the final decision. (R. 1.) Plaintiff filed a timely appeal with the Court.

(Compl.)

### a. Hearing before the ALJ

On August 8, 2017, Plaintiff appeared at the hearing with a non-attorney representative, Oliver Harwood.[1]  (R. 137.)  The ALJ heard testimony from Plaintiff and vocational expert Thomas Hyman.  (R. 138.)

### i. Plaintiff's testimony

Plaintiff previously served approximately fourteen years in prison for possession of marijuana and served time pursuant to convictions for possession of cocaine and heroin.  (R. 145–46.)  He was most recently incarcerated in 2013.  (R. 146.)  From 2013 to 2016, Plaintiff lived in a shelter, and toward the end of 2016, he moved to an apartment with his girlfriend and step-son.  (R. 143–44.)

For approximately two months in 2014, Plaintiff was self-employed as a barber and was working out of his apartment.  (R. 147–48.)  Plaintiff spent approximately two hours standing up in an eight-hour work day because he "did not have . . . many people to cut" and "it wasn't like . . . a real business."  (R. 148.)  Plaintiff's employment as a barber did not require him to lift more than two pounds.  (R. 148.)  Plaintiff stopped cutting hair because of pain in his fingers and back.  (R. 148.)

Plaintiff has not applied to other jobs since September of 2014 because he is "in constant pain," and is "always depressed and not able to stay focused" for long periods of time.  (R. 148–49.)  Plaintiff has sought treatment from Dr. Antoine Pierre, a psychiatrist, for approximately two years and meets with Dr. Pierre once a month.  (R. 149.)  Plaintiff also attends therapy with a mental health counselor every two weeks.  (R. 150.)  Plaintiff takes psychiatric medication which

---

[1]  The transcript identified Mr. Harwood as Plaintiff's attorney, (R. 137), however, the Appointment of Representative form identifies Mr. Harwood as a "non-attorney representative," (R. 245).

makes him feel better, and pain medications which help reduce his pain.  (R. 152.)

Plaintiff uses a prescribed cane and hearing aid.  (R. 152.)  He uses the cane at home and when he goes outside.  (R. 153.)  He uses a hearing aid only in his left ear because his insurance would not pay for hearing aids for both of his ears.  (R. 153.)

Plaintiff used heroin approximately three times per week from September of 2014 to January of 2017.  (R. 154–55.)  Plaintiff also consumed Percocet, which he obtained from his mother.  (R. 155.)  Sometime after September of 2014, Plaintiff "went to a program for the use of the Percocet[] because [he] was getting addicted."  (R. 156.)  Plaintiff also participated in a Suboxone substance program from January of 2017 to May of 2017 and gets "fentanyl patches for [his] pain."  (R. 156.)

Plaintiff cannot shower or dress himself because of pain and is not able to do any household cleaning.  (R. 157–58.)  He cannot "bend over and [his] fingers . . . cramp[] up a lot." (R. 157.)  Plaintiff can sometimes prepare sandwiches but cannot lift a gallon of milk.  (R. 157, 163.)  He does not do any grocery shopping and only goes outside for his doctor appointments or to pick up his medicine at the pharmacy with his girlfriend.  (R. 158–59, 164.)  Plaintiff does not play sports, tries to draw "here and there," listens to music, reads, and uses his telephone, but only for calls.  (R. 161.)  Plaintiff typically wakes up at 5:00 AM, takes his medicine, sits in his living room, and lies down.  (R. 162.)  Plaintiff sometimes sits for about two and a half hours but then lies down to relieve pressure on his lower back.  (R. 163.)  Plaintiff does not have friends and does not socialize.  (R. 162.)  He suffers from paranoia, does not trust people, and "always think[s] someone's out to hurt [him] or harm [him]."  (R. 163.)

### ii. Vocational expert testimony

Hyman testified as a vocational expert ("VE") during Plaintiff's hearing. (R. 169.) The ALJ identified Plaintiff's past work as a self-employed barber. (R. 167.) The ALJ summarized Plaintiff's earlier testimony as cutting hair while sitting for six out of eight hours, standing for two out of eight hours, and lifting no more than two pounds. (R. 167.) However, Mr. Harwood informed the ALJ that he did not believe Plaintiff testified to working an eight-hour day or sitting for six hours while cutting hair. (R. 167.) Plaintiff clarified that it would only take him thirty minutes to cut someone's hair, that he did not work every day, and that he would work at most two hours a day. (R. 168–69.) The ALJ then asked the VE whether there were any jobs available in the national economy for a hypothetical individual with the same physical ability to perform work with Plaintiff's age, educational background, work history, and transferable skills,

> who can lift and carry [twenty] pounds occasionally, ten pounds frequently, stand and walk for six out of eight hours, sit for six out of eight hours, occasionally climb stairs, balance, stoop, kneel crouch and crawl, but no climbing ladders, no concentrated exposure to hazards and loud noise. Someone who's limited to simple, routine tasks, occasional contact with supervisors and co-workers and rare contact with the public.

(R. 65.) The VE testified that such a hypothetical individual would be able to be a photocopying machine operator, housekeeper, and mail clerk. (R. 170–71.) The VE further testified that customary tolerance for absences, including being late or leaving early, is once per month or six times per year and testified that employers "typically" permit "one mid-morning break for [fifteen] minutes, one midday break for one half hour, [and] one mid-afternoon break for [fifteen] minutes." (R. 171.) The VE also testified that employers "[t]ypically" tolerate a worker being off task no more than five percent of a work shift. (R. 171–72.)

### b. Medical evidence

#### i. Evidence of physical impairments

##### 1. Dr. Michael Sein

On October 9, 2014, Plaintiff met with Dr. Michael Sein at New York Presbyterian Weill Cornell Department of Rehabilitation Medicine with complaints of lower back pain. (R. 390.) Plaintiff complained that his pain ranged from a six to ten on a ten-point scale and reported that he felt sore and experienced aching, burning, shooting, throbbing, tenderness, sharpness, and pulling with a radiating sensation. (R.391.) Plaintiff's pain worsened by bending forward and backward, sitting, standing, walking, twisting, lying down, coughing, and sneezing. (R. 391.) Upon examining Plaintiff, Dr. Sein diagnosed Plaintiff with lumbar spondylosis and a gunshot wound to the abdomen. (R. 393.) Dr. Sein prescribed Plaintiff Gabapentin. (R. 393.)

Plaintiff met with Dr. Sein again on October 23, 2014, with complaints of pain. (R. 395.) Plaintiff did not report any reduction in pain with Gabapentin. (R. 395.) Upon examining Plaintiff, Dr. Sein again diagnosed Plaintiff with lumbar spondylosis and gunshot wound of abdomen. (R. 395.) He also diagnosed Plaintiff with neuropathic pain. (R. 395.)

##### 2. Dr. William Reisacher

On October 9, 2014, Plaintiff sought treatment from Dr. William Reisacher for his hearing impairment. (R. 388.) Dr. Reisacher's physical examination of Plaintiff's ears was unremarkable. (R. 388.) Dr. Reisacher diagnosed Plaintiff with sensorineural hearing loss. (R. 388–89.) That same day, Eric Nelson, an audiologist, performed an audiogram on Plaintiff, which showed profound hearing loss in Plaintiff's right ear and mild hearing loss on Plaintiff's left ear. (R. 639–45.)

### 3.  Dr. Lyudmila Trimba

On May 11, 2015, Plaintiff met with Dr. Lyudmila Trimba for a one-time consultative examination.  (R. 420.)  Dr. Trimba noted that Plaintiff's "[g]ait was slow," that he "could do [one-quarter] of a squat," had a normal stance, was not using an assistive device, and "it appeared [Plaintiff] did not need an assistive device."  (R. 422.)  Dr. Trimba indicated that Plaintiff declined to walk on his heels and toes due to back pain.  (R. 422.)  Dr. Trimba noted "decreased [range of motion] in [Plaintiff's] [l]umbar spine," an extension of zero degrees, a flexion forty degrees, bilateral lateral flexion of ten degrees, lumbar spine rotation of ten degrees, and positive straight leg test bilaterally at forty degrees in a supine position and forty-five degrees seated.  (R. 423.)  She also noted a "[g]rip strength [five of five] bilaterally" as to the fine motor activity of Plaintiff's hands.  (R. 423.)  Dr. Trimba diagnosed low back pain, left forearm pain post fracture, right hand pain post fracture, poor hearing, and mental disorder with a guarded prognosis.  (R. 423.)  Dr. Trimba's medical source statement noted "moderate limitation in [Plaintiff's] ability to sit, stand, and walk for a prolonged time" and "moderate limitation in his ability to climb steps, push, pull, and carry heavy objects."  (R. 423.)  Dr. Trimba suggested that Plaintiff avoid frequent bending.  (R. 423.)

### 4.  Dr. Allen Small

On August 26, 2015, Plaintiff met with Dr. Allen Small, a primary care internist, with complaints of lower back pain.  (R. 462.)  Upon a general examination of Plaintiff, Dr. Small assessed a back disorder, depressive disorder, hearing loss, heartburn, counseling, urinary problems, and tobacco use disorder.  (R. 463.)

On September 25, 2015, Plaintiff met with Dr. Small again, and the examination yielded consistent findings, diagnoses, and treatment plans with Plaintiff's August 26, 2015 visit with

Dr. Small.  (R. 455–61.)

### 5.    New York Medical and Diagnostic

#### A.    Dr. Mitchell Kaphan

On August 29, 2015, Plaintiff met with Dr. Mitchell Kaphan, an orthopedic surgeon, for an orthopedic consultation.  (R. 480.)  Dr. Kaphan assessed a "gunshot injury with extension in to the lumbosacral spine and radiculopathy secondary to blunt trauma and permanent injury of never root."  (R. 481.)  Dr. Kaphan's examination of Plaintiff's lower back showed a "scar into the gluteal area representing the area of gunshot which ha[d] healed" and "[range of motion] of the lumbar spine show[ed] a forward flexion of about [sixty-five out of ninety degrees], extension [zero out of thirty degrees] and painful, lateral bending right and left [were] each [fifteen out of twenty-five degrees] and painful, rotation right and left [were] each [five out of thirty degrees] painful."  (R. 481.)  Dr. Kaphan referred Plaintiff to physical therapy for six weeks, pain management for further treatment and use of narcotics, and prescribed Plaintiff Nycynta in place of narcotics.  (R. 481.)

On September 12, 2015, Plaintiff met with Dr. Kaphan for an orthopedic follow-up appointment.  (R. 478.)  Plaintiff reported pain in his lower back but that he felt a little better compared to his previous visit.  (R. 478.)  Dr. Kaphan reviewed x-rays and found that they did not show significant abnormalities.  (R. 478.)  Dr. Kaphan recommended that Plaintiff participate in physical therapy three times per week for six weeks.  (R. 478.)

#### B.    Samuel Boulos

On September 9, 2015, Plaintiff met with Samuel Boulos, a physical therapist ("PT") at New York Medical and Diagnostic.  (R. 484.)  PT Boulos noted the following range of motion: "flexion 16/60 with pain; extension: 3/25 with pain; left rotation: 6/30 with pain; right rotation:

4/30 with pain; left lateral bending: 7/25 with pain; right lateral bending: 6/25 with pain." (R. 484.)

### 6. Dr. Yakov Perper

On March 4, 2016, Plaintiff met with Dr. Yakov Perper, a pain management specialist, complaining of lower back pain radiating to his left mid-thigh. (R. 585.) Plaintiff reported that his pain was a seven on a ten-point scale. (R. 585.) Dr. Perper's physical examination of Plaintiff revealed diffuse lumbosacral tenderness, pain with passive lumbar flexion, extension, and bilateral lateral bending. (R. 586.) Dr. Perper noted decreased muscle tone in Plaintiff's lower extremities and four out of five strength in the hamstrings bilaterally. (R. 586.) She further noted that Plaintiff's quadriceps strength was a four out of five bilaterally, his right hip flexion strength was a four out of five, left hip flexion strength was a four out of five, and knee-jerk reflex was one plus bilaterally. (R. 486.) Dr. Perper diagnosed Plaintiff with fibromyalgia and myalgia. (R. 586.) She also administered a lumbar trigger point injection. (R. 587.)

On March 21, 2016, Plaintiff met with Dr. Perper for a follow-up visit and Plaintiff complained of back pain. (R. 588.) Dr. Perper's examination findings remained consistent. (R. 588.) Dr. Perper diagnosed Plaintiff with lumbar disc degeneration and lumbar radiculopathy and prescribed Neurontin. (R. 588–89.)

On April 7, 2016, Plaintiff met with Dr. Perper for another follow-up visit. (R. 590.) Dr. Perper's examination findings were the same as the findings on March 4 and 21, 2016. (R. 590.) Dr. Perper did not prescribe any medication during Plaintiff's April 7, 2016 follow-up visit. (R. 591.)

### ii.    Evidence of mental impairments

#### 1.    Dr. Toula Georgiou

On May 11, 2015, Plaintiff met with Dr. Toula Georgiou for a consultative examination. (R. 426–29.)  Plaintiff reported being hospitalized at least four times for drug related issues between 1990 and 2001.  (R. 426.)  Plaintiff also reported having depressive symptoms but no anxiety symptoms, difficulty falling asleep, or agitation.  (R. 426.)  Plaintiff reported being able to dress, bathe, groom, and use public transportation on his own.  (R. 428.)  Plaintiff also reported that his physical and mental impairments limited his abilities to cook, clean, do laundry, shop, and mange his money.  (R. 428.)  Dr. Georgiou noted that Plaintiff's attention and concentration and recent remote memory skills were "mildly impaired."  (R. 427.)  Dr. Georgiou opined that Plaintiff "may have difficulty maintaining a regular schedule, relating with others, making decisions in a work setting, dealing with stress, and performing some complex task[s]."  (R. 428.)  Dr. Georgiou further opined that the "results of the present evaluation appear[ed] to be consistent with psychiatric issues and this may significant[ly] interfere with the [Plaintiff's] ability to function on a daily basis."  (R. 428.)  Dr. Georgiou diagnosed Plaintiff with polysubstance abuse in remission and unspecified depressive disorder and personality disorder. (R. 428.)

#### 2.    Long Island Consultation Center (LICC)

Plaintiff began psychiatric treatment at the Long Island Consultation Center in May of 2015.  (R. 560.)  On May 28, 2015, David Akman, a social worker ("SW"), stated that Plaintiff was in treatment at LICC for paranoid schizophrenia.  (R. 430.)

On May 29, 2015, Dr. Carl Rosenmann completed a psychiatric evaluation of Plaintiff. (R. 573.)  Dr. Rosenmann noted that Plaintiff "needed to sit with his left ear closer to [him] in

order to hear due to being beaten with a gun." (R. 574.) Plaintiff was cooperative, although he "had taken a 2 mg alprazolam before" the evaluation. (R. 574.) Plaintiff's speech was disorganized, he did not appear to be "responding to internal stimuli," he appeared sad, and his "insight and judgment seemed fair and he struggle[d] to maintain good judgment." (R. 574.) Dr. Rosenmann recommended that Plaintiff continue weekly psychotherapy, continue taking Alprazolam, and prescribed Plaintiff Chlorpromazine and Depakote. (R. 575.)

On June 11, 2015, Dr. Rosenmann met with Plaintiff for twenty minutes and issued a low risk assessment. (R. 576.) Dr. Rosenmann noted that Plaintiff "had side effect of priapism when he took chlorpromazine." (R. 576.) Dr. Rosenmann prescribed Alprazolam, Perphenazine, and Depakote. (R. 576.)

On June 25, 2015, Plaintiff met with Dr. Rosenmann for a follow-up visit. (R. 577.) Plaintiff reported feeling better with Perphenazine. (R. 577.) On July 13, 2015, Plaintiff had another follow-up visit with Dr. Rosenmann and Dr. Rosenmann reported that Plaintiff "continues auditory hallucinations" and that Plaintiff "may respond better with increase in perphenazine." (R. 578.) On the same day, Dr. Rosenmann completed a Treating Physician's Wellness Plan Report for Plaintiff's application to a public assistance program. (R. 437.) Dr. Rosenmann indicated that Plaintiff's current diagnoses were schizoaffective and post-traumatic stress disorder. (R. 437.) Dr. Rosenmann stated that Plaintiff could not work for at least twelve months. (R. 438.) He noted that Plaintiff was severely traumatized, had a history of assault related to illness, and had served many years in prison. (R. 438.)

On July 15, 2015, Dr. Rosenmann completed a questionnaire about Plaintiff's mental impairments. (R. 444–46.) He stated that Plaintiff was treated for schizoaffective disorder and PTSD, had a guarded prognosis, and received monthly pharmacotherapy and weekly

psychotherapy. (R. 444.) Dr. Rosenmann opined that Plaintiff had: fair to poor attitude, appearance, behavior, speech, thought, and perception; poor mood; normal affect; fair to poor attention and concentration; full orientation; and fair to poor memory, information, and insight and judgment. (R. 444–45.) Dr. Rosenmann opined that Plaintiff was unable to function in any work setting. (R. 445.)

At a follow up visit on August 13, 2015, Dr. Rosenmann indicated that there was "not much difference in [Plaintiff's] symptoms with increase in [P]erphenazine." (R. 579.) Plaintiff was "still troubled by auditory hallucination[s] and feeling angry." (R. 579.) Dr. Rosenmann kept Plaintiff's prescribed dosages the same. (R. 579.)

On August 17, 2015, SW Akman noted that Plaintiff was unable to engage in any sort of employment. (R. 454.) SW Akman also noted that Plaintiff had daily hallucinations, paranoid ideas, and local isolation. (R. 454.)

On August 24, 2015, Plaintiff met with Dr. Rosenmann for a follow-up visit. (R. 580.) Dr. Rosenmann indicated that there was "[n]ot much difference with increasing perphenazine." (R. 580.) At a follow-up visit on September 11, 2015, Plaintiff reported sleeping "very poorly" and being in a "depressed mood, not wanting to get up in the morning." (R. 581.) Dr. Rosenmann increased Plaintiff's Prozac dosage to help him become "less tense" and help him sleep. (R. 581.) However, at a follow-up visit on October 15, 2015, Dr. Rosenmann reported that Prozac made Plaintiff "sleep worse" and that Plaintiff was experiencing "racing thoughts." (R. 582.) Dr. Rosenmann therefore stopped prescribing Plaintiff Prozac. (R. 582.) At follow-up visits on November 20, 2015 and December 11, 2015, Dr. Rosenmann noted that Plaintiff was becoming more irritable, but that being off Prozac was "helpful." (R. 583–84.)

On December 21, 2015, Plaintiff was discharged from treatment at LICC due to

insurance related issues.  (R. 558.)

### 3.   E. Selesner

On July 29, 2015, state agency psychological consultant E. Selesner, Psy. D., reviewed

evidence from Drs. Georgiou and Rosenmann and provided an opinion as to Plaintiff's mental

residual functional capacity.  (R. 184–86.)  Dr. Selesner stated that Plaintiff's allegations about

his mental limitations were "credible but not to the extent alleged."  (R. 186.)  She opined that

Plaintiff was "able to follow supervision and relate to co-workers," that Plaintiff "appears

capable of sustaining attention and responding to changes in the work setting," and that Plaintiff

"appears capable of performing simple tasks in a work setting in which he would not have

frequent contact with the public."  (R. 186.)

### 4.   Upper Manhattan Mental Health Center

On March 7, 2016, counselor Mark Simon and Ray Hall, a social worker at the Upper

Manhattan Mental Health Center ("UMMHS") (also known as Emma L. Bowen Community

Services Center) performed an intake examination of Plaintiff.  (R. 491–504.)  Plaintiff reported

"assaultive behavior . . . mental illness . . . sexual and physical abuse during childhood . . .

numerous assault [and] robbery charges . . . around [fifteen] years total incarceration time,

hearing voices and having racing thoughts at night, . . . [and] feeling paranoid a lot of the time."

(R. 494.)  A mental status examination revealed that Plaintiff was fully oriented, had fair

appearance and relatedness, normal psychomotor activity, and a fair attitude.  (R. 499.)  Plaintiff

exhibited coherent speech, depressed mood, and appropriate affect.  (R. 499.)  Plaintiff's thought

process was logical and he reported somatic delusions and visual hallucinations.  (R. 499.)  He

further exhibited fair judgment, insight, and memory and had average intelligence and fair

impulse control.  (R. 499–500.)  SW Hall diagnosed Plaintiff with schizoaffective disorder,

tobacco use disorder, and "R/O Posttraumatic Stress Disorder."  (R. 500.)

### A.  Dr. Antoine Pierre

On March 10, 2016, Plaintiff met with Dr. Antoine Pierre, a psychiatrist at Upper Manhattan Mental Health Center, for a mental examination.  (R. 502.)  Dr. Pierre's examination of Plaintiff revealed normal appearance and appropriate attire, calm and cooperative interview behavior, and audible speech.  (R. 504.)  Plaintiff had full range affect, and exhibited goal directed thought process and paranoid thought content.  (R. 504.)  His mood was dysthymic, anxious, irritable, sad, and angry.  (R. 504.)  Plaintiff reported vague auditory hallucinations, had clear sensorium, fair orientation, and fair thinking capacity.  (R. 505.)  Plaintiff exhibited a short attention span, easy distractibility, forgetful memory, fair remote memory, and limited intellectual capacity.  (R. 505.)  Plaintiff's impulse control was poor and his insight and judgment were fair.  (R. 506.)  Dr. Pierre diagnosed Plaintiff with bipolar disorder by history, and prescribed Perphenazine, Divalproex, Mirtazapine, and Alprazolam.  (R. 506–07.)

On January 10, 2017, Dr. Pierre co-signed a psychiatric assessment prepared by Social Worker Basil Lucas based on Plaintiff's weekly appointments from March 15, 2016.  (R. 633–38.)  Dr. Pierre and SW Lucas diagnosed Plaintiff with "bipolar I."  (R. 633.)  They reported that Plaintiff "responds well to current therapist."  (R. 633.)  They assessed marked limitation in Plaintiff's ability to interact with others,[2] moderate limitation in Plaintiff's "concentration,

---

[2]  According to the assessment form, "this area of functioning refers to the ability to relate to and work with supervisors, co-workers, and the public."  (R. 634.)

persistence or pace,"[3] and marked limitation in Plaintiff's ability to adapt or manage oneself.[4] (R. 634.) SW Lucas and Dr. Pierre opined that Plaintiff would have difficulty "understanding and learning terms, instruction, and procedures, following one or two step oral instructions, describing work activity to someone else, asking and answering questions and providing explanations, recognizing a mistake and correcting it, identifying and solving problems, and sequencing multi-step activities." (R. 636.) They further reported that Plaintiff would have difficulty cooperating with others, "asking for help when needed, handling conflicts with others, understanding and responding to social cues (physical, verbal, emotional), responding to requests, suggestions, criticism, correction and challenges." (R. 636.) In addition, Plaintiff would have difficulty "working at an appropriate and consistent pace, completing tasks in a timely manner, ignoring or avoiding distractions while working, changing activities or work setting without being disruptive, working close to or with others without interrupting or distracting them, sustaining an ordinary routing and regular attendance at work, [and] working a fully day without needing more than the allotted number or length of rest periods during the day." (R. 637.) Dr. Pierre and SW Lucas opined that Plaintiff can maintain attention/concentration satisfactorily for less than seventy-five percent of an eight-hour workday. (R. 635.) They further opined that Plaintiff's conditions is likely to produce "good" days and "bad" days and that it is likely that Plaintiff would have to be absent from work as a result of his psychiatric symptoms for more than four days per month. (R. 635.)

A treatment plan review dated July 13, 2017 showed treatment for bipolar I disorder,

---

[3] According to the assessment form, "this area of functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate." (R. 634.)

[4] According to the assessment form, "this area of functioning refers to the ability to regulate emotions, control behavior, and maintain well-being in a work setting." (R. 634.)

schizoaffective disorder, NOS, and opioid use disorder moderate to severe. (R. 648.) Plaintiff exhibited good physical health, had no psychiatric hospitalizations, an adequate support system, adequate housing, social/interpersonal skills, and motivation for treatment. (R. 651.)

### B. Dr. Olga Wildfeuer

On May 17, 2016, UMMHC referred Plaintiff to Dr. Olga Wildfeuer, an internist, for Suboxone treatment. (R. 594.) Plaintiff reported last using heroin the day before and that he averaged ten bags when he was using. (R. 594.) An examination of Plaintiff revealed that he appeared anxious but generally well and not in acute distress. (R. 594.) Plaintiff's motor strength and reflexes were normal. (R. 594.) Plaintiff scored a seventeen and eighteen on the Patient Health Questionnaire-9 depression screening, indicating moderately severe depression. (R. 594–600.)

On May 24, 2016, Plaintiff returned to Dr. Wildfeuer for medication refills. (R. 600–01.) Plaintiff appeared alert and oriented, and well developed and well nourished. (R. 600.) Dr. Wildfeuer diagnosed Plaintiff with opioid abuse and uncomplicated and major depressive disorder, recurrent, in partial remission. (R. 600.) Plaintiff's urine screen was positive for fentanyl. (R. 601.) Plaintiff's May of 2016 and June of 2016 toxicology tests were also positive for opiates. (R. 595–96, 600–01.) A July of 2016 toxicology test was positive for benzodiazepines and opiates. (R. 608.) Plaintiff's August and December of 2016 toxicology tests were negative for opiates. (R. 614, 630.)

### c. Evidence submitted to the Appeals Council

Plaintiff submitted his UMMHC treatment records from March 7, 2016 through October 23, 2017 to the Appeals Council.[5]  (R. 2, 33–136.)  Plaintiff's Mental Health Counselor, Simon, diagnosed Plaintiff with bipolar disorder.  (R. 39.)  During Plaintiff's first psychotherapy session with Simon on April 25, 2016, Simon noted that Plaintiff "presented as psychiatrically stable, but quite depressed."  (R. 43.)  Simon assessed Plaintiff as suffering from severe depression, PTSD symptoms, mild mania, and psychosis.  (R. 44.)  During another psychotherapy session on May 6, 2016, Plaintiff reported continuing to feel "severely depressed and described feelings of helplessness/hopelessness."  (R. 47.)  Simon again assessed Plaintiff as suffering from depression.  (R. 48.)

During a follow-up psychotherapy session on May 20, 2016, Plaintiff reported previously using heroin and denied major life changes since his previous session.  (R. 49.)  Simon assessed Plaintiff as "[d]ysthymic, emotionally closed off, defensive."  (R. 49.)  At another psychotherapy session on June 17, 2016, Plaintiff reported being "clean for the past [three] weeks," and reported "feeling better in this regard," but still feeling depressed every day, "sleeping a lot, staying to himself most of the time, and thinking about the past."  (R. 54.)  Simon assessed Plaintiff as suffering from depression.  (R. 55.)  On July 15, 2016, Plaintiff met with Simon for a psychotherapy session and Plaintiff reported a discrepancy in Dr. Pierre's administration of his Xanax (Alprazolam) prescription.  (R. 58.)  Plaintiff requested a new psychiatrist, Deepika Singh, M.D.  (R. 58.)  Simon assessed Plaintiff as being irritated.  (R. 59.)  At another psychotherapy session on July 29, 2016, Plaintiff appeared frustrated at Dr. Singh's reluctance to

---

[5]  The ALJ did not have the UMMHC records when she rendered her decision.  (*See generally* R.)

prescribe Xanax because she believed it was the wrong medication for Plaintiff. (R. 63.) Plaintiff met with Simon on September 12, 2016 for another psychotherapy session at which time Plaintiff "reported feeling much better." (R. 71.) Simon noted Plaintiff was "euthymic." (R. 71.)

On October 5, 2016, Plaintiff again met with Simon for a psychotherapy session. Plaintiff "reported getting agitated by stressors lately, feeling overwhelmed, and punching walls on at least two occasions, resulting in injuries to his hand that required stitches." (R. 75.) Simon assessed Plaintiff as depressed. (R. 75.) At a psychotherapy session on November 16, 2016, Simon assessed Plaintiff as being very depressed and unmotivated. (R. 82.) He noted that Plaintiff's lack of motivation "presented as a major barrier to all other treatment in therapy" because Plaintiff "does not report having much hope that efforts to improve his life will be fruitful." (R. 81.)

Plaintiff's wife was in attendance at a psychotherapy session on December 7, 2016. (R. 85–86.) Simon recommended Plaintiff try vocational rehabilitation services to help him get a job despite his criminal record, which Plaintiff reported as a barrier to obtaining work. (R. 85.) On December 30, 2016, Plaintiff's case was transferred to a new therapist, Basil Lucas. (R. 90.) Lucas assessed Plaintiff as stable. (R. 91.) On January 30, 2017, Plaintiff reported to Lucas that he was elated about moving into permanent housing and had spent the weekend painting his new home and was planning a Super Bowl party. (R. 93.) Plaintiff met with Lucas again on February 8, 2017, at which time Plaintiff appeared stable and cooperative. (R. 95.)

On February 22, 2017, Plaintiff returned to therapy with Lucas, accompanied by his wife and another staff member, because he had been using heroin again. (R. 99.) Plaintiff blamed guests at his home as triggers for his drug use. (R. 99.) On March 8, 2017, Plaintiff reported life

at home as being stable.  (R. 101.)  Lucas assessed Plaintiff as stable "and continuing to work on harm reduction [in] a stable home."  (R. 102.)  On March 15, 2017, Plaintiff appeared at a psychotherapy session with his wife and discussed his birthday party.  (R. 103.)  Plaintiff reported that he "continued to utilize harm reduction as a means to significantly reduce his opioid use."  (R. 103.)  Lucas reported that Plaintiff was "stable and staying on course for harm reduction."  (R. 104.)

On April 12, 2017, Plaintiff reported that he had joined a gym, and was trying to buy a car and a machine to start a shirt design business.  (R. 107.)  Lucas observed that Plaintiff was happy and calm, although evasive in response to questions about his substance use.  (R. 107.)  On May 2, 2017, Plaintiff admitted to Lucas that he had recently overdosed on heroin and that the incident scared him.  (R. 111.)  On May 23, 2017, Plaintiff presented as irritable and angry while waiting for an appointment.  (R. 109.)  Plaintiff was so upset that he began to cry.  (R. 109.)  Plaintiff also felt "frustrated at home because he feels [like he is] in a crowd and no one hears him cry for help."  (R. 109.)  Lucas indicated that Plaintiff was in physical pain and stressed at home.  (R. 110.)  On June 1, 2017, Plaintiff reported feeling "physically better" but reported that he had not been going to support meetings.  (R. 113.)  On June 5, 2017, Plaintiff discussed his options for attending a detox treatment program and Lucas assessed Plaintiff as "struggling with his addiction."  (R. 115.)  Plaintiff met with Lucas again on June 21, 2017, and reported that he had spent only one week in drug treatment.  (R. 117.)  Lucas assessed Plaintiff as "stable and working toward his goal of absolute sobriety."  (R. 117.)  During a psychotherapy session on June 28, 2017, Plaintiff admitted to a recent relapse and expressed frustration that his wife would not do anything with him outside of the home and was "frustrated wit[h] her negative attitude in the street."  (R. 119.)  Lucas assessed Plaintiff as "upset but physically stable."  (R.

119.)  On August 9, 2017, Lucas noted Plaintiff's frustration with the ALJ in his disability claim because the ALJ had questioned him about his substance abuse and Plaintiff was struggling to find activities to participate in outside of the home.  (R. 121.)  Lucas reported being "concerned about [Plaintiff's] mood."  (R. 121.)  Follow-up psychotherapy sessions through September 22, 2017 remained generally consistent with reports from [Plaintiff's] prior sessions.  (R. 123–25.).

### d.   The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the SSA.  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 17, 2014, the disability onset date.  (R. 12.)  Second, the ALJ found that Plaintiff had the following severe impairments: "degenerative disc disease; biltateral sensorineural hearing loss — total in right ear, partial in left; post-traumatic stress disorder; bipolar disorder; and polysubstance abuse."  (R. 12.)  Third, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or was equal to the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations.  (R. 19–20.)  Specifically, the ALJ found that Plaintiff only had moderate difficulties understanding, remembering, or applying information, interacting with others, maintaining concentration persistence or pace, and mild difficulty in his ability to adapt or manage himself.  (R. 13–14.)  The ALJ relied on mental status examinations and the opinions of psychological consultative examiners in making these findings.  (R. 14.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform:

> light work . . . except [Plaintiff] can lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six of eight hours' and sit for six of eight hours.  The [Plaintiff] can occasionally climb stairs, balance, stoop, kneel, crouch, and crawl, but can never climb ladders.  He must avoid concentrated exposure to hazards and loud noise.  The [Plaintiff] can perform simple,

routine tasks and have occasional contact with supervisors and [sic]
but no contact with the public.

(R. 21.)  In support of his determination, the ALJ purports to have relied on "objective medical evidence and other evidence," as well as "opinion evidence."  (R. 15.)  In making the RFC assessment, the ALJ assigned "great weight" to the functional assessments prepared by internal medical consultant Dr. Trimba and psychological consultant Dr. Georgiou.  (R. 19.)  The ALJ assigned these opinions "great weight" because "these examiners are specialists and both have an understanding of social security disability programs and evidentiary requirements," and are supported by objective medical evidence.  (R. 19.)  The ALJ also found these opinions to be consistent with the record as a whole.  (R. 19.)

The ALJ assigned "limited weight" to the medical opinion of Plaintiff's treating psychologist Dr. Pierre because Dr. Pierre's "statement generally fails to identify specific, relevant clinical data in support of its relatively severe restrictions."  (R 19–20.)  The ALJ stated that "[a]lthough it is expected that such opinions will rely to some extent on symptoms, it is not unreasonable that the pertinent signs and laboratory findings that one would expect a treating provider to have in the claimant's treatment record should also be presented in support of a statement noting function limitations."  (R. 20.)  Lastly, the ALJ stated that "medial evidence in this instance suggests that [Plaintiff's] mental functioning improves with proper treatment."  (R. 20.)

The ALJ also assigned "limited weight" to the statements of Case Manager David Akman and Dr. Rosenmann, who treated Plaintiff during the relevant period.  (R. 20.)  The ALJ stated that the "statements have limited probative value, as neither individual expressed his opinion in terms of specific, vocationally relevant functional limitations" and "[i]nstead, both individuals offered multiple statements to the effect that [Plaintiff] is unable to work."  (R. 20.)

The ALJ assigned "partial weight" to the opinion of state agency consultant Dr. Selesner because her opinion "is based upon a thorough review of the available medical record and a comprehensive understanding of the agency rules and regulations." (R. 20.)

In light of the medical evidence, Plaintiff's testimony, and the VE's testimony, the ALJ found that Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 22.) As a result, the ALJ determined that Plaintiff was "not disabled." (R. 22.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be

upheld.").

The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner.  *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see also Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'"  *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b.    Availability of benefits

SSI is available to individuals who are "disabled" within the meaning of the SSA.[6]  To be considered disabled under the SSA, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.*

---

[6] Supplemental security income is available to individuals who are either sixty-five years of age or older, blind or disabled and who meet certain income requirements.  42 U.S.C. §§ 1382(a), 1382c(a)(1)(A); 20 C.F.R. § 416.202.  The only issue before the Court is whether Plaintiff is disabled.

§§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at *20 C.F.R. § 404.1520"); McIntyre*, 758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. Analysis

Plaintiff argues that the Court should remand this action for further administrative proceedings because (1) the ALJ failed to adequately develop the record, (2) new and material evidence warrants remand, and (3) the ALJ's determination at Step Five is based on factual and legal errors. (Pl. Mem. 17–24.)

The Commissioner argues that the ALJ applied the correct legal standards and correctly

evaluated Plaintiff's impairments in determining that Plaintiff is not disabled and that the evidence submitted to the Appeals Council does not warrant remand.  (Comm'r Mem. 21–33.)

### i.    The ALJ failed to adequately develop the record

Plaintiff argues that the ALJ failed to provide a full and fair hearing by failing "in her duty to develop the record where she recognized that relevant records were missing yet failed to obtain them."  (Pl. Mem. 17–18.)

The Commissioner argues that the ALJ adequately developed the record as to the "relevant records" identified by Plaintiff.  (Comm'r Mem. in Further Supp. of Comm'r Mot. and in Opp'n to Pl. Mot. ("Comm'r Opp'n Mem."), Docket Entry No. 22.)

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative."[7] *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same).  But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."  20 C.F.R. § 404.1527(c)(2);[8] *see*

---

[7]  The regulations define "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1502).  A "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]."  20 C.F.R. § 416.902.

[8]  On January 18, 2017, the SSA published a final rule that changed the protocol for evaluating medical opinion evidence.  See Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416).  The "new regulations apply only to claims filed on or after March 27, 2017." *Smith v. Comm'r*, 731 F. App'x 28, 30 n.1 (2d Cir. 2018).  Because Plaintiff's claim was filed prior to

*Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

If an ALJ declines to give a treating physician's opinion controlling weight, the ALJ must consider a number of factors to determine how much weight to assign to the treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)) (discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) ("At both steps, the ALJ must give good reason in its notice of determination or decision for the weight it gives the treating source's medical opinion." (alterations, citation, and internal quotation marks omitted)); *Halloran*, 362 F.3d at 32. "An ALJ's failure to 'explicitly' apply the Burgess factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96. "If the Commissioner has not otherwise provided good reasons for its weight assignment," the district court is unable to conclude that the procedural error is harmless, and remand is therefore appropriate, so that the ALJ can

---

that date, the Court refers to versions of the regulations that were in effect prior to March 27, 2017. *See White v. Comm'r*, No. 17-CV-4524, 2018 WL 4783974, at *4 (E.D.N.Y. Sept. 30, 2018) ("While the Act was amended effective March 27, 2017, the [c]ourt reviews the ALJ's decision under the earlier regulations because the [p]laintiff's application was filed before the new regulations went into effect." (citation omitted)).

"comprehensively set forth its reasons." *Id.* (alterations, citation, and internal quotation marks

omitted); *see also Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012) (finding

that failure "to provide good reasons for not crediting the opinion of a claimant's treating

physician is a ground for remand."); *Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand

when the Commissioner has not provided 'good reasons' for the weight given to a treating

physician[']s opinion."). However, if a "searching review of the record" assures the court that

the "substance of the treating physician rule was not traversed," the court will affirm. *Estrella*,

925 F.3d at 96 (quoting *Halloran*, 362 F.3d at 32).

In addition, although a "claimant has the general burden of proving that he or she has a

disability within the meaning of the Act, . . . 'because a hearing on disability benefits is a

nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the

administrative record.'" *Burgess*, 537 F.3d at 128 (alteration omitted) (first citing *Draegert v.

Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002); and then quoting *Melville v. Apfel*, 198 F.3d 45, 51

(2d Cir. 1999)); *see also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013)

("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts and develop the

arguments both for and against the granting of benefits.'" (quoting *Vincent v. Comm'r of Soc.

Sec.*, 651 F.3d 299, 305 (2d Cir. 2011))). Pursuant to the ALJ's duty to develop the record, the

ALJ must attempt to fill gaps in the record. *See Rosa*, 168 F.3d at 79 & n.5 (explaining that the

ALJ must attempt to fill "clear gaps" in the record, but "where there are no obvious gaps . . . and

where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation

to seek additional information); 20 C.F.R. § 416.912(d)(2) (requiring the ALJ to develop

claimant's complete medical history); *see also Moran v. Astrue*, 569 F.3d 108, 112–13 (2d Cir.

2009) (holding that when a claimant waives his right to counsel and proceeds pro se, the ALJ has

a "heightened" duty to "develop the record in light of the essentially non-adversarial nature of a benefits proceeding"); *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) (noting that the ALJ must "protect a pro se claimant's rights by ensuring that all of the relevant facts [are] sufficiently developed and considered" (citation and internal quotation marks omitted)).

In making the RFC finding and concluding that Plaintiff is not disabled, the ALJ assigned "limited weight" to treating physician Dr. Pierre's medical opinion because the medical source "statement generally fails to identify specific, relevant clinical data in support of its relatively severe restrictions." (R. 19–20.) The ALJ further reasoned that the "medical evidence in this instance [a 2015 report from the Long Island Consultation Center] suggests that [Plaintiff's] mental functioning improves with proper treatment." (R. 20.) In assigning Dr. Pierre's medical opinions "limited weight," the ALJ did not make sufficient effort to ascertain the basis of Dr. Pierre's medical opinions, and therefore failed to discharge her duty to develop the record.

The parties do not dispute that Dr. Pierre is a treating source whose opinion regarding the "nature and severity" of Plaintiff's mental impairments warrants deference "in all but a limited range of circumstances," *Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015). (*Compare* Def. Mem. 28 (recognizing Dr. Pierre as a treating source) *with* Pl. Mem. 19–20 (describing Dr. Pierre as a treating psychiatrist). Indeed, the record shows that Dr. Pierre treated Plaintiff at UMMHC and prescribed medication on multiple occasions for over a year. (R. 647–62.)

The ALJ nevertheless assigned only "limited weight" to Dr. Pierre's opinion, reasoning that the opinion "generally fails to identify specific, relevant clinical data in support of its relatively severe restrictions." (R. 19.) However, the ALJ did not make reasonable efforts to obtain the "relevant clinical data" which could have possibly supported Dr. Pierre's opinion.

At the administrative hearing, Plaintiff's representative, Mr. Harwood, told the ALJ that

he "was only able to obtain [Plaintiff's] psychiatric assessment [from UMMHC], absent a subpoena." (R. 141.) Mr. Harwood noted that the ALJ previously "submitted a subpoena for treatment notes from [UMMHC]," but was not sure if the ALJ "received a response yet." (R. 141.) The ALJ did not confirm or deny whether she had received treatment notes from UMMHC, (see generally R.), and based on the submissions to the Appeals Council, the ALJ had not received the relevant UMMHC records. By assigning Dr. Pierre's medical opinion "little weight" for lack of "relevant clinical data," (R. 20), without obtaining the treatment notes from UMMHC, the ALJ failed to develop the record before declining to give controlling weight to Dr. Pierre's medical opinion. *See Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017) ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (citing *Burgess*, 537 F.3d at 128)); *see also Collins v. Comm'r of Soc. Sec.*, No. 11-CV-5023, 2013 WL 1193067, at *9 (E.D.N.Y. Mar. 22, 2013) ("[T]he ALJ has a threshold duty to adequately develop the record before deciding the appropriate weight to give the treating physician's opinion." (citing *Burgess*, 537 F.3d at 129)); *Rocchio v. Astrue*, No. 08-CV-3796, 2010 WL 5563842, at * 11 (S.D.N.Y. Nov. 19, 2010) ("Because of the considerable weight ordinarily accorded to the opinions of treating physicians, an ALJ's duty to develop the record on this issue is all the more important" (internal citations and quotation marks omitted), *report and recommendation adopted*, 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011); *Hinds v. Barnhart*, No. 03-CV-6509, 2005 WL 1342766, at *10 (E.D.N.Y. Apr. 18, 2005) ("The requirement that an [administrative law judge] clarify a treating source's opinion that a claimant is unable to work is part of the ALJ's affirmative obligation to develop a claimant's medical history.").

Efforts to ensure that the record contains all relevant evidence from treating sources

before favoring the opinion of a consultative examiner is especially critical when the claimed disability pertains to a plaintiff's mental health. *See, e.g., Santiago v. Barnhart*, 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006) (finding that the treating physician rule "is even more relevant in the context of mental disabilities, which by their nature are best diagnosed over time"); *see also Elliott v. Colvin*, No. 13-CV-2673, 2014 WL 4793452, at *17 (E.D.N.Y. Sept. 24, 2014) ("[T]he ALJ's duty to develop the record was heightened in light of [the p]laintiff's alleged psychiatric impairment." (citing cases)).

The ALJ issued a subpoena to UMMHC on July 25, 2017, requesting Plaintiff's "entire mental health record and treatment notes from 3/10/2016 to the present and any other evidence in your possession relating" to Plaintiff's case. (R. 275.) The ALJ held the hearing on August 8, 2017 and rendered her decision on August 30, 2017. (R. 22.) The ALJ appears not to have made any attempt after the hearing to request records from UMMHC and, at the hearing, did not confirm whether she had received treatment notes from UMMHC. (R. 142.) Moreover, the UMMHC records were not received until after the ALJ rendered her decision. Under the circumstances of this case, the subpoena issued to UMMHC did not relieve the ALJ of her duty to develop the record. *See Sanchez v. Barnhart*, 329 F. Supp. 2d 445, 451 (S.D.N.Y. 2004) ("Merely issuing a subpoena by mail is not the legal equivalent of making 'every reasonable effort' to obtain the medical reports." (citing 20 C.F.R. § 404.1512(d))); *see also Davis v. Colvin*, No. 15-CV-479, 2016 WL 4708515, at *8 (W.D.N.Y. Sept. 9, 2016) ("Given the significance of the missing records and the impact their absence had on the [administrative law judge's] decision, the ALJ should have tried to obtain the records on his own after not hearing from [the plaintiff's] counsel. By not doing so, the [administrative law judge] created a gap in the record that necessitates remand."). Because the lack of treatment notes appears to have

influenced the ALJ's decision to discount the opinion of Dr. Pierre, the ALJ was required to "make at least one additional follow-up request to fulfill [h]er duty to develop the record." *Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 218 (S.D.N.Y. 2017); *see also Martinez v. Comm'r of Soc. Sec.*, No. 17-CV-10253, 2019 WL 1236324, at *5 (S.D.N.Y. Mar. 18, 2019) (finding that the administrative law judge failed to develop the record where the records were "critical" to the administrative law judge's decision to discount the opinion of a treating source).

The Commissioner's reliance on *Drake v. Astrue*, 443 F. App'x 653, 656 (2d Cir. 2011), to argue that the ALJ fulfilled her duty to develop the record is unpersuasive. In *Drake*, the record demonstrated that the administrative law judge made reasonable efforts to develop the record by sending several letters to the relevant facility and to the plaintiff's doctor, the facility "responded by sending several pages of medical records," and "nothing in the record suggests that the [administrative law judge] should have known that [the agency's] response was incomplete." *Id.* In contrast, the ALJ received from UMMHC (1) a psychosocial history dated March 15, 2016 (the intake form), (2) a psychiatric assessment dated January 10, 2017, and (3) a treatment plan review dated July 13, 2017. (R. 494–507, 633–37, 647–62.) Notably, the July 10, 2017 psychiatric assessment indicated that Plaintiff was being treated at UMMHC on a weekly basis. (R. 633.) Given the lengthy treatment period, the fact that Plaintiff was being treated at UMMHC on a weekly basis, and Mr. Harwood's statement during the hearing that he was not able to obtain the records absent a subpoena, the ALJ should have known that additional records existed which may have supported Dr. Pierre's medical opinion and thus impact the ALJ's determination as to how much weight to assign Dr. Pierre's medical opinion.

Accordingly, the Court finds that remand is appropriate in view of the ALJ's failure to adequately develop the record by failing to make an additional effort in securing treatment notes

from Dr. Pierre. *See Jakubowski v. Berryhill*, No. 15-CV-6530, 2017 WL 1082410, at *16 (E.D.N.Y. Mar. 22, 2017) ("To the extent that the [administrative law judge's] conclusions rested on the absence of 'objective' mental status examinations or consistent case file notes from a psychiatrist, the [administrative law judge] was required to develop the record and to obtain information relevant to a disability determination." (internal citation omitted) (first citing *Burgess*, 537 F.3d at 128; and then citing *Tankisi*, 521 F. App'x at 33)); *Khan v. Comm'r of Soc. Sec.*, No. 14-CV-4260, 2015 WL 5774828, at *15–16 (E.D.N.Y. Sept. 30, 2015) (finding that the ALJ "ignored his affirmative duty to develop the record" by rejecting the opinions of treating sources "for lack of documentary support"); *Orr v. Comm'r of Soc. Sec.*, No. 13-CV-3967, 2014 WL 4291829, at *7 (S.D.N.Y. Aug. 26, 2014) ("The Second Circuit case law . . . makes plain that an [administrative law judge] is not free to conclude that a treating physician's report lacks sufficient evidentiary support without first asking the physician to provide such support." (first citing *Rosa*, 168 F.3d at 80; and then citing *Schall v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998))).

> ### ii. The Appeals Council erred in refusing to consider new and material evidence.

Plaintiff argues that the Appeals Council erred in refusing to consider the UMMHC record. (Pl. Mem. 20–21.)

The Commissioner argues that the Appeals Council properly refused to consider the UMMHC record because it is cumulative of the evidence already in the record. (Comm'r Mem. 33.)

The Appeals Council must consider evidence proffered by a claimant that is both new and material. 20 C.F.R. § 404.970(b); *see Lesterhuis*, 805 F.3d at 86 (citing *Perez*, 77 F.3d at 45); *see also Suttles v. Colvin*, 654 F. App'x 44, 47 (2d Cir. 2016) ("Under the Commissioner's

regulations, the Appeals Council will consider new and material evidence only if it relates to the relevant period on or before the date of the ALJ's decision."). Evidence is "new" if it is "not merely cumulative of what is already in the record." *Lebow v. Astrue*, No. 13-CV-5895, 2015 WL 1408865, at *4 (S.D.N.Y. Mar. 9, 2015) (citation omitted); *see also Patterson v. Colvin*, 24 F. Supp. 3d 356, 372 (S.D.N.Y. 2014) (quoting *Lisa v. Sec'y of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991)). "Evidence is material if it is relevant to the claimant's condition during the time period for which benefits were denied, and there is a reasonable possibility that the new evidence would have influenced the ALJ to decide the claimant's application differently." *Suttles*, 654 F. App'x at 47 (citing *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)); *see also Maloney v. Berryhill*, No. 16-CV-3899, 2018 WL 400772, at *4 (E.D.N.Y. Jan. 12, 2018) ("In order to qualify as 'material' evidence, the new evidence submitted to the appeals council must be 'both (1) relevant to the claimant's condition during the time period for which benefits were denied and (2) probative. The concept of materiality requires, in addition, a reasonable probability that the new evidence would have influenced the Commissioner to decide claimant's application differently.'" (alteration omitted) (quoting *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004))); 20 C.F.R. § 404.970(b) ("If new and material evidence is submitted, the Appeals Council . . . shall evaluate the entire record including the new and material evidence submitted . . . . It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.").

Where the Appeals Council fails to consider new and material evidence submitted after the ALJ renders his opinion, a district court should remand the case for reconsideration in light of the new and material evidence. *See Garcia v. Comm'r of Soc. Sec.*, 208 F. Supp. 3d 547, 551–52 (S.D.N.Y. 2016) ("Where the Appeals Council fails to appropriately consider new and

material evidence . . . the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence." (citation and internal quotation marks omitted)); *see also Shrack v. Astrue*, 608 F. Supp. 2d 297, 302 (D. Conn. 2009) (stating that when the Appeals Council "fails to [consider new and material evidence], the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence").

The Appeals Council erred in failing to consider treatments notes from UMMHC because the notes were both new and material.

As an initial matter, the Commissioner does not challenge that the UMMHC treatments notes are properly classified as new evidence. *See* Comm'r Mem. 33 ("The Appeals Council properly concluded the new evidence submitted to it was not material . . . ."). In addition, the treatment notes are new because the record before the ALJ did not contain any treatment notes from UMMHC and it appears that UMMHC did not compile and produce the treatment notes until after the ALJ rendered her decision.

Moreover, the UMMHC treatment notes are material. In her opinion, the ALJ discounted Dr. Pierre's medical opinion for lack of relevant clinical data. The UMMHC treatment notes during the relevant period may have led the ALJ to defer to Dr. Pierre's assessment. Indeed, the ALJ noted that a 2015 report "suggests that [Plaintiff's] mental functioning improves with proper treatment." (R. 20.) However, treatment notes from the UMMHC record documented ongoing interpersonal conflicts, poor coping skills, depression, racing thoughts, PTSD symptoms, lack of motivation, and fluctuation in Plaintiff's mental functioning, thus supporting Dr. Pierre's assessment. (R. 33–136, 633–38.) Therefore, based on the limited record, it is possible that the UMMHC records would have influenced the ALJ to decide Plaintiff's case differently. *See Miller v. Colvin*, No. 13-CV-6462P, 2015 WL 1431699, at *13 (W.D.N.Y. Mar. 27, 2015) ("To

be material, there must be "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently.").

The Commissioner argues unpersuasively that the UMMHC record is "largely cumulative of evidence already in the record." (Comm'r Mem. in Opp'n 4.) The record only contains a UMMHC (1) psychosocial history dated March 15, 2016, (2) psychiatric assessment dated January 10, 2017, and (3) treatment plan review dated July 13, 2017. (R. 494–507, 633–37, 647–62.) Indeed, the ALJ specifically noted the lack of data from UMMHC to support Dr. Pierre's medical opinions in deciding to assign "limited weight" to the opinions. (R. 19–20.) Thus, the Commissioner's argument that the UMMHC record is "largely cumulative" of the evidence in the record is without merit.[9]

Because the Appeals Council did not consider additional material evidence from UMMHC, the Court finds that remand is also appropriate on this basis. *See Wilbon v. Colvin*, No. 15-CV-756, 2016 WL 5402702, at *5 (W.D.N.Y. Sept. 28, 2016) (stating that if the Appeals Council fails to consider material evidence relating to the relevant time period, "the proper

---

[9] In addition, the Commissioner's argument that the UMMHC evidence was largely cumulative was not an argument advanced by the Appeals Council. The Appeals Council only stated that "the evidence does not show a reasonable probability that it would change the outcome of the decision" and therefore "did not consider and exhibit this evidence." (R. 2.) The Court is not required to accept appellate counsel's post hoc rationalization for the Appeals Council's refusal to consider the UMMHC record. *See Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (stating that a reviewing court "may not accept appellate counsel's post hoc rationalizations for agency action"); *Gardner v. Colvin*, No. 16-CV-2385, 2019 WL 3753797, at *17 (E.D.N.Y. Aug. 8, 2019) (rejecting appellate counsel's argument as to why the administrative law judge would have found a physician's psychotherapy notes unnecessary because the court "will not accept 'these post hoc rationalizations for agency action.'" (quoting *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962))); *Webb v. Berryhill*, No. 15-CV-971, 2017 WL 1148331, at *4 (W.D.N.Y. Mar. 28, 2017) (rejecting the Commissioner's reasons because they "amount to impermissible post hoc rationalizations of the [administrative law judge's] decision").

course for the reviewing court is to remand for reconsideration in light of the new evidence");

*see also Randazzo v. Barnhart*, 332 F. Supp. 2d 517, 521 (E.D.N.Y. 2004) (stating that

documents that were not considered by the Commissioner can only be analyzed "as a basis for

remand").[10]

---

[10]  Because the Court remands this action for further administrative proceedings based on the ALJ's failure to develop the record and the Appeals Council decision to not review new and material opinion evidence from UMMHC, the Court declines to address Plaintiff's additional argument that the ALJ's Step Five determination is based on legal and factual error as the ALJ will necessarily have to reassess the weight to be given to Dr. Pierre's medical opinions. *See Staib v. Colvin*, 254 F. Supp. 3d 405, 409 (E.D.N.Y. 2017) ("Because the record before the [administrative law judge] was so deficient and flawed, the [c]ourt cannot engage in any meaningful analysis of whether he correctly applied the treating physician rule, whether his decision is supported by substantial evidence, or whether he properly weighed the [p]laintiff's credibility." (collecting cases)).

However, the Court directs the ALJ to further develop the record to determine whether Plaintiff's cane is necessary and to consider whether further development of the record is required as to Plaintiff's diagnosis of fibromyalgia and myalgia.  In her decision, the ALJ stated that Plaintiff "uses a cane that was not prescribed." (R. 16.)  However, Plaintiff testified during the hearing that his cane was prescribed. (R. 152.)  Social Security Ruling ("SSR") 96–9p provides that there "must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describes the circumstances for which the assistive device is needed (i.e. whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." *See* SSR 96–9p. SSR 96-9p does not require that a hand-held assistive device be prescribed to be considered medically necessary, but it does require specific medical documentation establishing its need and circumstances surrounding its need. *Id.* ("[T]here *must* be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed.").  The ALJ stated that "the medical evidence generally suggests that the [Plaintiff] has not used [the cane] consistently, as few, if any, of the [Plaintiff's] medical records note use of a device." (R. 17.)  Although there is no medical evidence currently in the record establishing the need for a cane, Dr. Trimba's one-time observation that Plaintiff does not appear to need a cane does not conclusively address whether Plaintiff's cane is necessary.  The ALJ should seek to obtain evidence from Plaintiff's treating physicians with respect to whether or not his cane is necessary.  In addition, Dr. Perper, a pain management specialist who treated Plaintiff on several occasions during the relevant period, diagnosed Plaintiff at least once with fibromyalgia and myalgia.  (R. 586.)  However, the ALJ did not discuss this diagnosis in her decision.  On remand, the ALJ should follow up with Plaintiff's treating physicians to the extent necessary to properly evaluate Plaintiff's possible fibromyalgia and myalgia. *See, e.g., Cooper v. Comm'r of Soc. Sec.*, No. 17-CV-1058, 2019 WL 1109573, at *5 (W.D.N.Y. Mar. 11, 2019) (remanding for the ALJ to "properly evaluate" the plaintiff's fibromyalgia under SSR 12-2p; "the ALJ's error in this case stemmed not from a severity conclusion, but from the

## III. Conclusion

For the foregoing reasons, the Court denies the Commissioner's motion for judgment on the pleadings and grants Plaintiff's motion. The Court vacates the Commissioner's decision and remands this action for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

Dated: August 21, 2019
      Brooklyn, New York

SO ORDERED:

       _____s/ MKB_____
       MARGO K. BRODIE
       United States District Judge

---

conclusion that [claimant's] fibromyalgia is not even a medically determinable impairment[;] [t]his distinction is significant because an ALJ may credit a claimant's statements about her symptoms and functional limitations only if the impairment to which they relate is medically determinable[;] . . . [p]ut another way, because the ALJ concluded that [plaintiff's] fibromyalgia [was] not a medically determinable impairment, she had no basis to credit [plaintiff's] statements regarding her fibromyalgia-related symptoms in the remainder of her decision"); *Casselbury v. Colvin*, 90 F. Supp. 3d 81, 94 (W.D.N.Y. 2015) (remanding where the administrative law judge "did not consider the potential functional limitations as a result of [the p]laintiff's fibromyalgia symptoms after discounting [the p]laintiff's fibromyalgia as a medically determinable impairment").